J. S31045/17

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: C.P.W., C.W., G.W., J.W., | : | IN THE SUPERIOR COURT OF |
| MINORS | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.C., NATURAL MOTHER | : | No. 276 WDA 2017 |

Appeal from the Order, January 24, 2017,
in the Court of Common Pleas of Allegheny County
Orphans' Court Division at Nos. CP-02-AP-0000025-2015,
CP-02-AP-0000026-2015, CP-02-AP-0000027-2015,
CP-02-AP-0000070-2016

| | | |
|---|---|---|
| IN RE: C.P.W., C.W., G.W., J.W., | : | IN THE SUPERIOR COURT OF |
| MINORS | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.C., NATURAL MOTHER | : | No. 277 WDA 2017 |

Appeal from the Order, January 24, 2017,
in the Court of Common Pleas of Allegheny County
Orphans' Court Division at Nos. CP-02-AP-0000025-2015,
CP-02-AP-0000026-2015, CP-02-AP-0000027-2015,
CP-02-AP-0000070-2016

| | | |
|---|---|---|
| IN RE: C.P.W., C.W., G.W., J.W., | : | IN THE SUPERIOR COURT OF |
| MINORS | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.C., NATURAL MOTHER | : | No. 278 WDA 2017 |

Appeal from the Order, January 24, 2017,
in the Court of Common Pleas of Allegheny County
Orphans' Court Division at Nos. CP-02-AP-0000025-2015,
CP-02-AP-0000026-2015, CP-02-AP-0000027-2015,
CP-02-AP-0000070-2016

J. S31045/17

IN RE:  C.P.W., C.W., G.W., J.W.,    :    IN THE SUPERIOR COURT OF
MINORS    :    PENNSYLVANIA
    :
APPEAL OF:  C.C., NATURAL MOTHER    :    No. 279 WDA 2017


Appeal from the Order, January 24, 2017,
in the Court of Common Pleas of Allegheny County
Orphans' Court Division at Nos. CP-02-AP-0000025-2015,
CP-02-AP-0000026-2015, CP-02-AP-0000027-2015,
CP-02-AP-0000070-2016


BEFORE:  PANELLA, J., DUBOW, J. AND FORD ELLIOTT, P.J.E.


MEMORANDUM BY FORD ELLIOTT, P.J.E.:    **FILED:  MAY 15, 2017**

C.C. ("Mother") appeals from the January 24, 2017 order entered in the Court of Common Pleas of Allegheny County, Orphans' Court Division, granting the petition of the Allegheny County Office of Children, Youth and Families ("CYF") and involuntarily terminating her parental rights to her dependent children, C.P.W., female child, born in July of 2010 ("C.P.W."); C.W., male child, born in October of 2011 ("C.W."); G.W., male child, born in September of 2012 ("G.W."), and J.W., male child, born in May of 2014 ("J.W.") (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b).[1]  After review, we affirm.

---

[1] In the same order, the trial court terminated the parental rights of the Children's father, C.W. ("Father"), also pursuant to Sections 2511(a)(2), (5), (8), and (b).  Father has filed an appeal at Superior Court Docket No. 241 WDA 2017.

- 2 -

The trial court summarized the relevant procedural and factual history as follows:

> The family has had a lengthy history of involvement with [CYF]. Mother, C.C., has a total of eight children ranging in age from 14 to 2 years old[Footnote 1]. [CYF] received its first referral in 2002. Numerous other referrals have been made and services have been offered to the family throughout the years. Mother gave birth to C.P.W. [in July of 2010], C.D.W. [in October of 2011][Footnote 2], and G.W. [in September of 2012][Footnote 3]. However, all of the referrals were closed and further Court intervention was not required.
>
> > [Footnote 1] There are three children not subject to the termination proceedings, Z.L., T.J. and J.R.
> >
> > [Footnote 2] [CYF] became involved with the family briefly after C.D.W.'s birth in 2011 after Mother testified positive for THC.
> >
> > [Footnote 3] [CYF] became involved again with the family after G.W.'s birth in 2012 after receiving reports about Mother's alleged substance abuse.
>
> [CYF] received its most recent referral in 2013 and a Petition for Dependency was filed on February 7th, 2013. The bases for alleging dependency were Mother's substance abuse issues, truancy concerns for the older children, and concerns about the lack of developmental and medical services that the younger children were receiving. Prior to the Adjudicatory Hearing, [CYF] implemented services to work with the family to address their concerns. The agency was able to ascertain the identity of the Father, C.W. (hereinafter Father), of C.P.W., C.D.W., and G.W. Although Father had knowledge of [CYF]'s involvement with

the family, he did not engage with any services prior to the Adjudicatory Hearing. After further investigation, [CYF] discovered that the parents had filed numerous Protection From Abuse Petitions (hereinafter PFA Petitions) against one another. Domestic violence therapy was added as a goal for the family based upon the allegations contained within the PFA Petitions. Father had been present in Mother's home a number of times that various service providers appeared, which contributed to the concerns that the [C]hildren may have witnessed incidents of domestic violence.

The parties appeared for an Adjudicatory Hearing on February 26th, 2013 and the case was continued so that Father could obtain counsel. Mother obtained counsel prior to the hearing and the Court appointed KidsVoice to represent the [C]hildren. Father refused to take a drug test on the date of the hearing. The parties next appeared on April 2nd, 2013 for an Adjudicatory Hearing but it was continued because it conflicted with one of Mother's Criminal Court proceedings[Footnote 4]. The parties appeared on May 14th, 2013 and the [C]hildren were adjudicated dependent pursuant to 42 Pa.C.S.A. § 6302(1)[Footnote 5]. The Court ordered that the [C]hildren remain in Mother's care and that she attend and cooperate with parenting classes as well as comply with all of her other Family Service Plan goals. Father did not appear but the Court was informed that he had been arrested the month before and charged with two counts of Possession. The Court ordered that he was to comply with his goals and attend to his criminal matters. The Court Appointed Special Advocates (hereinafter CASA) were appointed by separate order for each of the [C]hildren on May 14th, 2013.

> [Footnote 4] Mother was arrested for allegedly selling a brick of heroin out of her home and was facing felony drug charges.

[Footnote 5] Mother stipulated that she was in need of assistance in obtaining drug and alcohol treatment and with childcare.

A Permanency Hearing was held on August 28th, 2013. Father was incarcerated at the time of this hearing but Mother appeared. It was reported that Mother had lost her housing and the family was living with a relative. Mother had continuously tested positive for THC at her random drug screens. Additionally, [CYF] was unable to verify that Mother was engaged in mental health treatment. The Court allowed the [C]hildren to remain in Mother's care but ordered that In-Home Services be increased to "crisis" level to alleviate the Court's concerns. Mother was ordered to ensure that all of the [C]hildren's medical needs were being met and that the youngest children, C.D.W. and G.W. be enrolled at Matilda Theiss Therapeutic Nursery and Preschool. The Court ordered both Mother and Father to complete domestic violence treatment as part of their Family Service Plan goals. The parent's [sic] compliance and progress were deemed to be minimal. The Court found that [CYF] had made reasonable efforts to finalize the permanency plan to prevent and eliminate removal from the home.

In September of 2013, Mother failed to allow the In-Home Service workers to enter the home. She had completed an intake assessment at Mercy Behavioral Health in mid-September of 2013 but it was unclear from the record whether Mother actually began treatment at the time of the assessment. In early October of 2013, [CYF] received reports that G.W. had two black eyes and that Mother provided conflicting stories about the cause of those injuries. As a result of these concerns, [CYF] sought and obtained an Emergency Custody Authorization on October 3rd, 2013 for all of the [C]hildren. All of the [C]hildren were removed with the exception of G.W., as he could not be located. A Shelter Hearing was held on October 4th, 2013 before Hearing Officer Mark Cancilla. Mother appeared but did not bring

G.W..[sic] The Court ordered continued placement of the [C]hildren based upon Mother's lack of cooperation with In-Home Services, her lack of cooperation in providing verification of mental health and drug and alcohol treatment, and because she had not enrolled G.W. in therapeutic preschool at Matilda Theiss. Mother had also missed a number of medical appointments for the [C]hildren. This was of particular concern because C.P.W. had been diagnosed with a genetic disorder which affected both her physical and developmental health. Father remained incarcerated at the time of the hearing. The parent's [sic] progress was deemed to be minimal. The Court made a finding that reasonable efforts were made to prevent removal from the home and that allowing the [C]hildren to return to the care of Mother would be contrary to their welfare. The whereabouts of G.W. were discovered and he was removed from his Mother's care on October 5th, 2013. A few days after the hearing, Father was transferred to an in-patient drug and alcohol facility, Cove Forge, from October 8th, 2013 until October 23, 2013. Upon his discharge from Cove Forge, it was recommended that he participate in intensive outpatient therapy. Father did not maintain any meaningful contact with [CYF] during this time. The Court ordered [CYF] to make a referral for the family to participate in individual and interactional evaluations. Dr. Terry O'Hara, a Court appointed psychologist from Allegheny Forensic Associates, was assigned to conduct evaluations of the family. He conducted an individual evaluation of Mother on November 11, 2013. Mother denied any incidents of domestic violence and minimized the allegations contained within the numerous Protection From Abuse petitions. Dr. O'Hara reported a number of concerns as Mother admitted to a history of domestic violence and substance abuse. Mother displayed a great deal of irritability and frustration during the evaluation and did not accept any responsibility for her current circumstances. She blamed the "system" for her frustration and lack of cooperation with service providers. Dr. O'Hara recommended that Mother seek mental health, drug

- 6 -

and alcohol and domestic violence therapy. Dr. O'Hara opined that Mother needed to attain some level of stability through working with services and attending anger management counseling before the [C]hildren could be returned to her care.

Parties appeared on November 20th, 2013 for a Shelter Review Hearing. Mother appeared but Father did not. The Court ordered all of the [C]hildren to remain in their various foster homes and converted them from Shelter Care to regular Foster Care placements. The Court further ordered Mother to comply with her Family Service Plan goals (specifically anger management), to attend visits, and comply with enrolling the three youngest [C]hildren in Matilda Theiss Preschool. The Court made a finding that reasonable efforts were made by [CYF] to prevent or eliminate the need for continued placement of the [C]hildren. Ultimately, the case was continued to another day to obtain reports and testimony from Dr. Terry O'Hara.

A continued Shelter hearing was held on December 10th, 2013 and the Court took all of the testimony under advisement. Father failed to appear but Mother did and was represented by counsel. The Court issued an order on December 17th, 2013 that the [C]hildren were to remain in placement, that Mother's visits were to remain status quo, that she was to comply with all of her goals, and that she sign releases and provide [CYF] with documentation that she was in compliance with her dual diagnosis treatment. The Court made a finding that reasonable efforts were made by [CYF] to prevent or eliminate the need for continued placement of the [C]hildren. Mother began treatment at Mercy Behavioral Health in December of 2013 and began cooperating with services.

The case was assigned to this Court on January 13th, 2014. It was reported that Mother had threatened the previous caseworker during the transition, thus necessitating the need to assign a new caseworker. [CYF] assigned caseworker

Renee Taddy to the case. Ms. Taddy began working with the family in January of 2014. Initially, Caseworker Taddy had a cordial relationship with Mother and was able to institute In-Home Services for her in the first month that she was assigned to the case. It was also discovered that Mother was pregnant again. Mother was fairly cooperative during this time and as such, the Court granted Mother's request to move visits into her home on February 25th, 2014. The parties appeared on March 12th, 2014 for a Permanency Review Hearing. Father failed to appear but Mother did and was represented by counsel. The Court ordered that the [C]hildren remain in placement and that Mother's visits could be increased at the discretion of [CYF]. The Court further ordered Mother to continue to work with In-Home Services, sign releases for her dual diagnosis treatment, comply with all other Family Service Plan goals, and cooperate with [CYF]. The Court made a finding that Mother was in moderate compliance. Mother's counsel filed a Motion on April 10th, 2014 requesting overnight visits with some of the [C]hildren. The Court granted the request and ordered that Mother could have one overnight visit with three of her older children[Footnote 6]. The Court agreed to hear argument on whether Mother could have one overnight visit on Mother's Day on May 7th, 2014 with all of the [C]hildren. At that hearing on May 7th, 2014, the Court ordered that Mother could have extended visits with C.P.W., C.D.W., and G.W. on a Saturday and an additional visit on Mother's Day. However, shortly after leaving the Court hearing, Mother went into labor with J.W. and delivered him that evening. J.W. was permitted to remain in his Mother's care after his birth. Mother identified the father of this child to be C.W., the father of G.W., C.D.W., and C.P.W. Almost immediately after his birth, [CYF] began to have concerns about Mother's care of the child. Mother discussed with Caseworker Taddy the possibility of placing the baby in foster care for a few days so that she could take a "booze cruise" with her friends. Additionally, the child was not in the home during many of the times

that the caseworker attempted to do random safety checks throughout the week.

> [Footnote 6] Two of these children are not part of the TPR proceedings.

Dr. O'Hara conducted an individual evaluation of Mother on June 24, 2014. The examiner had similar concerns as in the 2013 evaluation. Mother continued to engage in a romantic relationship with Father, despite ongoing incidents of domestic violence and continued emotional and mental instability. Mother continued to externalize blame for the removal of her [C]hildren. Additionally, she reported that she was no longer willing to work with services. Dr. O'Hara opined that Mother needed to obtain housing and re-engage with In-Home Services and anger management in order to provide the stability required for reunification.

During this time, Caseworker Taddy received reports from Mother's neighbors that Mother was partying frequently and that people were coming in and out of the residence numerous times a day. Mother confirmed that there was a great deal of foot traffic at her house but always had an excuse [as] to why this was occurring so frequently. The caseworker also had concerns that J.W. was being cared for by individuals not known to the agency. She continued to have limited access to the child in Mother's home. Additionally, Mother was attending medical and educational appointments sporadically during this time. Due to the great number of missed appointments, many important services for the [C]hildren were delayed. Often times [sic], the caseworker had to physically deliver releases and other documents to Mother or her counsel for signature as neither parent made themselves available to attend these appointments. Father did not attempt to contact Caseworker Taddy until June of 2014. When he did make contact with her, he advised her that he was not in [a] position to care for J.W. or any of his other children. During one of the home visits with the [C]hildren in June, Mother

was physically evicted from her residence. Based upon her lack of housing and various other concerns, the visits were changed back to supervised.

The parties appeared on July 2nd, 2014 for a Permanency Hearing. Mother appeared and was represented by counsel. Father failed to appear. The Court ordered that all of the [C]hildren remain in placement, that Mother receive anger management therapy, attend a domestic violence support group, cooperate with In-Home Services, find appropriate housing, and sign treatment releases[Footnote 7]. Mother's compliance was deemed to be minimal at this hearing and the agency was found to have provided reasonable efforts to prevent or eliminate the need for continued placement of the [C]hildren. The Court found Father to not be in compliance at all.

> [Footnote 7] With the exception of J.W., whom the Court allowed to remain in the care of Mother.

During the remaining summer months and during early fall, [CYF] received a number of reports that Mother was leaving J.W. with individuals not known to the agency and that there may not have been working utilities in her home. In addition, the police had been called to Mother's home a number of times for disputes amongst neighbors. It was also reported that Mother had become engaged in a physical altercation while she was holding J.W. and had handed him off to a bystander so that she could engage another woman in a fist fight. Mother had not been attending dual diagnosis treatment consistently and was not appearing for random drug screens called in by [CYF]. On October 10th, 2014, [CYF] requested and was granted an Emergency Custody Authorization order for J.W. based upon these concerns. Father advised the caseworker that he was unable to care for J.W. at that time but offered his Mother as a possible placement option. He had little to no contact with the caseworker prior to this discussion in October. Father reported living

with his paramour, who was the Mother of his two oldest children. However, Father refused to make her available to be assessed by Caseworker Taddy. Father had been more cooperative in signing releases and attending to the [C]hildren's educational and medical needs during this reporting period. Caseworker Taddy offered Father In-Home Services, a referral for The Coalition for Fathers and Families, an Urban League referral, and offered to set up supervised visitation. Father declined the In-Home Services but did agree to attend the Coalition for Fathers and Families.

A Shelter Hearing was held on October 14th, 2014. Mother appeared represented and Father failed to appear. The Court granted KidsVoice temporary Educational/Medical decision making [sic] rights until all of the [C]hildren could appear for a Permanency Hearing on October 28th, 2014. The Court also appointed KidsVoice for J.W. and placed him in the care of paternal grandmother, T.W. The Court made a finding that [CYF] made reasonable efforts to prevent removal of J.W. from the home and ordered them to file a Petition for Dependency. After the hearing that day, [CYF] filed a petition for Dependency for J.W.

The parties returned for a Permanency Hearing on October 28th, 2014. Mother appeared represented and Father appeared. The Court found Mother to be in minimal compliance and Father to have not complied at all. While Mother had made some initial progress with In-Home Services, her participation had gradually decreased throughout the year. As such, the Court ordered all In-Home Services to cease. The Court ordered that the [C]hildren remain in placement. The Court further ordered that Mother provide documentation that she had been engaging in dual diagnosis for treatment, domestic violence therapy, and to provide [CYF] with updated contact information. The Court ordered Father to contact [CYF]. The Adjudicatory hearing for J.W. was continued. The Court found that the agency had made reasonable efforts to prevent or

eliminate the need for continued placement of the [C]hildren.

An Adjudicatory Hearing was held for J.W. on December 17th, 2014. Both Mother and Father appeared and were represented by counsel. After hearing the evidence, the Court adjudicated J.W. dependent under 42 Pa.C.S.A. § 6302(1) as to both Mother and Father. The Court ordered Mother to attend random urine screens, attend parenting classes through Arsenal[Footnote 8], attend AFA evaluations and follow all recommendations, cooperate with her goals and attend and participate in domestic violence therapy. [CYF] was ordered to assist Mother with housing and transportation assistance. Father was ordered to undergo a drug and alcohol evaluation, submit to random urine screens, and attend the AFA evaluations and follow the recommendations. CASA was appointed to J.W.'s case on October 17th, 2014 by separate order.

> [Footnote 8] [CYF] had concerns that Mother was not providing adequate supervision during visits.

A Permanency/Goal Change hearing was scheduled for January 30th, 2015 for all of the [C]hildren[Footnote 9]. Mother appeared and was represented by counsel. Father did not appear but was represented by counsel. The Court ordered that the [C]hildren remain in placement, that Mother begin the parenting program at Arsenal, attend AFA evaluations and follow recommendations, continue dual diagnosis treatment and domestic violence therapy, and maintain suitable housing. Father[] was ordered to continue his involvement with Coalition for Fathers, attend dual diagnosis treatment, attend AFA evaluations and follow all recommendations. The Court found that both Mother and Father were in minimal compliance with their goals. Petitions for the Involuntary Termination of Parental Rights for C.P.W., C.D.W. and G.W., were filed on January 30th, 2015.

[Footnote 9] J.W.'s case was not scheduled for a goal change as he had only be[en] adjudicated dependent in December of 2014.

[CYF] filed a Motion to Ratify Placement of C.P.W., C.D.W., and G.W. and the Court granted the Motion on March 17th, 2015. All three children were placed into a new foster home. The Petitions for Involuntary Termination of Parental Rights were withdrawn on April 16th, 2015. Dr. O'Hara conducted individual and interactional evaluations with Mother and some of the [C]hildren in April of 2015. Dr. O'Hara had similar concerns as in the prior evaluations. Mother admitted to engaging in two incidents of domestic violence with Father, one of which resulted in her arrest. Dr. O'Hara noted that she accepted some responsibility for "letting her kids down" and did show some insight into the dynamics of the volatile relationship between herself and Father. However, Mother still continued to make excuses as to her lack of attendance at medical and educational appointments for the [C]hildren. She blamed the alleged victims in her criminal matters as well as the landlords in her eviction matters. Similar services were recommended as in the prior evaluations. Dr. O'Hara conducted an interactional evaluation of Mother and the [C]hildren on May 18th, 2015. He opined that Mother exhibited positive parenting skills throughout the evaluation but that she had difficulty in getting the [C]hildren to comply with her directives. While Dr. O'Hara did not believe that termination of Mother's parental rights was appropriate at that time, he believed that return of the [C]hildren would expose them to psychological instability, homelessness, and violence. Additionally, none of the [C]hildren were in long term placements at that time.

Dr. O'Hara conducted an individual and interactional evaluation of Father on June 8th, 2015[Footnote 10], where Father reported to Dr. O'Hara that he had suffered multiple "nervous

breakdowns". [sic] He had admitted to a history of mental health issues even prior to meeting Mother. He also admitted to a history of abusing alcohol and marijuana and that he had used marijuana a few weeks prior to the evaluation. Father reported being arrested and jailed on 13 separate occasions based upon false allegations made by Mother. Father was unwilling to discuss many details about his relationship with Mother but alleged numerous threats made towards him by her. Additionally, Father revealed that Mother allegedly set his paramour's home on fire in 2010. Father showed poor insight into Mother's progress and told Dr. O'Hara that he believed that she was doing everything that she was supposed to do. At that time, Dr. O'Hara recommended that Father participate in dual diagnosis intensive outpatient treatment, obtain appropriate housing, undergo a psychiatric consultation, and attend parenting classes. Dr. O'Hara also conducted an interactional evaluation with Father and the [C]hildren on the same date. Dr. O'Hara noted that Father was appropriate and played well with the [C]hildren. C.P.W. often overly directed herself towards Father while J.W. and G.W. did not, which caused the Doctor to opine that the [C]hildren had an insecure attachment to Father.

> [Footnote 10] Father had previously been scheduled to attend AFA evaluations five times but failed to appear.

The parties appeared on June 12th, 2015 and the hearing was continued so that the parties could review the aforementioned recommendations made by Dr. O'Hara.

In between hearings, a number of important medical and educational appointments were scheduled for the [C]hildren. A meeting for C.P.W., C.D.W., and G.W. was held at Matilda Theiss and Mother did not attend. As a result of Mother missing the meeting and not completing the paperwork,

C.D.W. did not receive vital services. Father was cooperative during this time in signing paperwork for the [C]hildren's educational needs. It was also reported to [CYF] during this time frame that Mother had come to Father's place of employment and struck him in the head with a glass bottle. Father had to be hospitalized due to the seriousness of the injury. Mother was criminally charged for this assault but the charges were later dismissed because Father failed to appear at the Preliminary Hearing. A few weeks later, Father was also alleged to have threatened Mother with a gun. He was arrested and charged as a result of this incident. His charges were also dismissed after Mother failed to appear at his Preliminary Hearing. Mother was arrested and charged with Retail Theft on May 18th and May 22nd, 2015. A Permanency Planning meeting was held in mid-July and Mother did attend. At this meeting, Mother threatened caseworker Taddy in front of several people. While discussing a goal change for the [C]hildren, Mother said "If you try to adopt my kids out, you will be sorry". [sic] Mother alleged that the caseworker had informed the [Allegheny County] Housing Authority of the pending termination proceedings and that they had denied Mother the chance to obtain a suitable home for the [C]hildren. As a result of this particular incident, Ms. Taddy asked to be removed as the caseworker for the family. A new caseworker, Richard Mudd[,] was assigned to the case[Footnote 11].

> [Footnote 11] Ms. Taddy remained on the case until October of 2015.

Parties appeared on July 24th, 2015 for a Permanency Review Hearing. Mother and Father attended and were represented by counsel. Mother's progress was determined to be minimal as she only attended 60% or 70% of her scheduled mental health treatment appointments and anger management treatment. She missed a number of random urine screens during this time. She had also not been consistent with visits that occurred at the Arsenal Parenting Program with J.W..[sic] Mother

attended approximately half of her visits with J.W., and as a result, her visits were reduced to once a week with him. She was more consistent with the visits for C.P.W., C.D.W., and G.W. which occurred twice a month. At the time of the hearing, Mother was in the process of being evicted again. The Court ordered Mother to continue domestic violence treatment, anger management classes, trauma therapy, mental health treatment, to obtain suitable housing, and to take random urine screes.[sic] Father was ordered to engage in dual diagnosis treatment[Footnote 12], attend parenting classes at Arsenal, attend domestic violence therapy, obtain housing, and comply with the AFA recommendations. Father's progress was deemed to be minimal as he had not attended visits regularly and had not sought dual diagnosis treatment. Father was also in need of appropriate housing and requested assistance from the agency despite refusing to provide [CYF] with a current address. [CYF] was ordered to make an Urban League referral to assist Father in obtaining housing, provide transportation assistance for the parents, and to provide Father with notice of all upcoming medical appointments for his [C]hildren. The Court held that [CYF] made reasonable efforts to prevent or eliminate the need for removal or continued placement of the [C]hildren. The Court ordered that the [C]hildren remain in placement with continued permission to place. All of the foster parents were given secondary educational and medical decision making [sic] rights.

> [Footnote 12] Father tested positive for THC at his screen on the day of this hearing.

The parties appeared on the 9th of October, 2015 for a Permanency Review Hearing. The new [CYF] caseworker, Richard Mudd, began working exclusively with the family in October. Mother and Father both appeared and were represented by counsel. The Court ordered that the [C]hildren remain in placement and that all previously ordered services remain in effect. Mother and Father were

ordered to continue to comply with their goals. The Court determined that Mother made minimal progress based upon her poor visitation, missed screens, lack of consistency with mental health treatment along with another pending eviction. During this period, Mother was arrested and charged with Retail Theft. Mother was also arrested and charged with Defiant Trespass, False Identification to Law Enforcement, and Disorderly Conduct. The more serious charges were withdrawn and Mother pled guilty to two counts [sic] Disorderly Conduct. The Court deemed Father's progress to be minimal as he consistently failed to appear for drug screens and had not engaged in dual diagnosis treatment[Footnote 13]. Father had not been in contact with the caseworker during this reporting period but had been attending visits with the older children more regularly. Father was residing with his grandmother at the time of the hearing and was unable to care for the [C]hildren in that home. The Court found that [CYF] made reasonable efforts to prevent or eliminate the need for removal or continued placement of the [C]hildren. C.P.W., C.D.W., and G.W. were moved to a pre-adoptive foster home and their caregivers were given secondary Educational and Medical Decision-Making Rights. The CASA worker assigned to the case resigned, and the Program Supervisor, Danielle Morrison, assumed the case at the end of 2015[Footnote 14].

[Footnote 13] Father reported that he continued to smoke marijuana.

[Footnote 14] CASA's recommendations for the family remained fairly the same throughout the history of the case. Namely that parents comply with their goals and ensure that the [C]hildren's medical and educational needs were being met.

A Permanency/Goal Change Hearing was held on January 5th, 2016. Mother and Father appeared

- 17 -

and were represented by counsel. The Court ordered that all [C]hildren remain in their current placements. Mother was ordered to continue mental health treatment, obtain suitable housing, attend regular urine screens, attend visits, sign releases, finish parenting classes, and maintain contact with the domestic violence therapist. Father was ordered to undergo dual diagnosis treatment, obtain appropriate housing, and attend regular drug screens. Visits were to remain status quo. [CYF] was ordered to investigate Mother's new residence. Both Mother and Father were deemed to be in minimal compliance. The Court found that [CYF] made reasonable efforts to prevent or eliminate the need for removal or continued placement of the [C]hildren. The Goal Change Hearing was continued to coincide with the Termination Hearing.

A Permanency Hearing was held on April 6th, 2016. Mother and Father both attended and were represented by counsel. Mother's health insurance lapsed in January of 2016 and she did not rectify the situation until shortly before this hearing. As such, she did not engage in mental health treatment during this period. At the time of the hearing, it was reported to the Court that the younger children, particularly C.D.W. and G.W., were acting out sexually. The Court ordered that foster parents seek out an appropriate mental health service to address these concerns. The Court ordered that the [C]hildren remain in placement. Mother was ordered to maintain stable housing, undergo a POWER evaluation and follow any of their recommendations, continue treatment at Mercy, sign medical releases, and attend the [C]hildren's medical appointments and AFA evaluations. Father was ordered to undergo a drug and alcohol evaluation and follow all recommendations, attend regular urine screens, sign releases, and attend the [C]hildren's medical appointments. There was an ongoing need for both Mother and Father to receive sign language training[Footnote15]. The Court found both parents to be minimally complaint [sic] with their goals and that [CYF] had made reasonable efforts to prevent or

eliminate the need for removal or continued placement of the [C]hildren.

> [Footnote 15] C.P.W. was largely non-verbal at the time of the hearing. Foster parents had received training and were able to effectively communicate with her by using American Sign Language.

Petitions for Involuntary Termination of Parental Rights were again filed on behalf of C.P.W., C.D.W., G.W., and J.W. on April 13th, 2016.

Dr. O'Hara conducted his final individual evaluation of both Mother and Father in June of 2016 as well as interactional evaluations with the parents and [C]hildren. Dr. O'Hara noted that Father externalized responsibility for the [C]hildren remaining in care. Dr. O'Hara was unable to evaluate Father's paramour and had no information that Father's household could appropriately meet the needs of the [C]hildren. Dr. O'Hara continued to have significant concerns about Father's history of drug and alcohol abuse coupled with significant mental health concerns which had previously warranted a psychiatric hospitalization. In both evaluations, Father reported using marijuana when he felt overwhelmed. Dr. O'Hara reported that Father blamed his use on [CYF] and stated that "CYF was not doing what they were supposed to be doing....It was so overwhelming...They want to overwhelm me". [sic] It was his opinion that even if Father and his paramour had a safe and stable home with no history of domestic violence, he still could not recommend placing four young children into their care. It was Dr. O'Hara's opinion that he could not recommend returning the [C]hildren to Father's care as he had no evidence to demonstrate that Father would be able to handle such a huge commitment. Dr. O'Hara supported his claim by referencing Father's lack of follow through with dual diagnosis treatment along with his paramour's lack of participation in an evaluation. It was Dr. O'Hara's

belief that any parent caring for four young children, 3 with special needs, would feel overwhelmed at times. More specifically, a parent who suffered from mental health issues would certainly be more inclined to feel overwhelmed.

In his evaluation of Mother, Dr. O'Hara reported that Mother appeared uncharacteristically lethargic. Mother denied being under the influence but her behavior was concerning enough that it was noted in Dr. O'Hara's report. During the evaluation, Mother continued to externalized [sic] responsibility for the circumstances that caused the [C]hildren's continued placement. Dr. O'Hara opined that return of the [C]hildren to Mother would place them at risk for exposure to substantial anger issues, criminal activity, homelessness, substance abuse, and aggression based upon her lack of progress in addressing her mental health and drug and alcohol goals.

Dr. O'Hara also conducted interactional and individual evaluations of the foster parents of C.P.W, C.D.W., and G.W. in which he concluded that they exhibited several positive parenting skills. The [C]hildren displayed several components of a secure attachment with their foster parents. Specifically, they "showed autonomy, spontaneously and frequently directed themselves to the [foster parents."] These individual evaluations were conducted based upon concerns expressed by CASA Supervisor Danielle Morrison regarding the care of the [C]hildren. However, Dr. O'Hara had no concerns about the foster parent's [sic] care of the [C]hildren. Additionally, he noted that "virtually all of the collateral resources that have worked with the [foster parents] have had no concerns about [their] care of the [C]hildren."

Dr. O'Hara conducted an individual and interactional evaluation of J.W.'s foster Mother and observed her to display a number of positive parenting skills. J.W. displayed several components of secure attachment with his foster Mother as well.

Trial court opinion, 2/17/17 at 4-20 (some brackets in original).

On January 24, 2017, the trial court entered an order that involuntarily terminated Mother's parental rights to the Children. On February 7, 2017, Mother filed a timely notice of appeal to this court and a Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal, which she amended on February 16, 2017. On February 17, 2017, the trial court filed its Rule 1925(a) opinion.

On appeal, Mother raises the following issue for our review:

> Did the trial court abuse its discretion and/or err as a matter of law in concluding that termination of [Mother's] parental rights would serve the needs and welfare of the Children pursuant to 23 Pa.C.S.[A.] § 2511(b)?

Mother's brief at 11.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial

> courts that often have first-hand observations of the parties spanning multiple hearings. **_See In re R.J.T._**, 9 A.3d [1179, 1190 (Pa. 2010)].

**_In re T.S.M._**, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." **_In re M.G._**, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." **_In re Adoption of T.B.B.,_** 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*), quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998).

In this case, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), and (8), as well as (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc)*. As Mother does not raise a challenge to the trial court's finding of grounds for termination under Section 2511(a) in the statement of questions involved section of her brief, Mother waives the issue on appeal. *Krebs v. United Refining Co. of Pa.*, 893 A.2d 776, 797 (Pa.Super. 2006) (reiterating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues). We, therefore, analyze the court's termination pursuant to Section 2511(b) only, which provides as follows:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental,

> physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

With regard to Section 2511(b), the Pennsylvania Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of*

- 24 -

***J.M.***, 991 A.2d 321, 324 (Pa.Super. 2010) (citations omitted). Additionally, when evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." ***In re Z.P.***, 994 A.2d 1108, 1121 (Pa.Super. 2010), citing ***In re K.K.R.-S.***, 958 A.2d 529, 533 (Pa.Super. 2008) (internal citations omitted).

Here, Mother contends that the trial court terminated her parental rights based on a faults-based analysis and that the trial court failed to sufficiently consider the negative effect termination could have on the Children. Mother offers only five sentences to support her contentions, as follows:

> In defense of its termination orders, the trial court relied on [Mother's] failure to meet her FSP and court ordered goals. The trial court noted "[t]he evidence presented demonstrates that the parents would not address their personal goals, let alone the needs of their children." Further, citing the observations of Dr. O'Hara, the trial court discussed the differences in ability of the Children's foster parents and [Mother]. Neither Dr. O'Hara nor the trial court addressed what effect termination of parental rights would have on the Children other than to suggest any potential negative effect would be outweighed by the benefits of their eventual adoptions. The trial court discounted Dr. O'Hara's testimony that termination of [Mother's] parental rights could have a negative effect on the Children as well as his opinion that maintaining the parent-child relationships through an open adoption arrangement was indicated.

Mother's brief at 19 (citations to trial court opinion and notes of testimony omitted).

Contrary to Mother's contentions, in examining Section 2511(b) and finding sufficient grounds for termination, the trial court concluded:

> When examining the bonds in this case, the interactional evaluations conducted by Dr. O'Hara were particularly telling. The [C]hildren were well behaved and played appropriately during the evaluations with their foster parents. The [C]hildren all sought out their foster parents throughout the evaluation and displayed several signs of a secure attachment with their respective foster parents. However, the children's behaviors were markedly different in the evaluations with their biological parents. . . . During Mother's interactional evaluation, an older child had to redirect G.W. and C.D.W. on numerous occasions. None of the children, C.D.W., G.W., or J.W., approached [M]other during the first half of the evaluation. The [C]hildren rarely responded to Mother's directives. Dr. O'Hara attributed the [C]hildren's behavior to the parent's [sic] lack of consistency and contact with the [C]hildren through visitation. Additionally, Dr. O'Hara explained that these behaviors were likely caused by the [C]hildren's feelings of anger and rejection towards their parents.
>
> With respect to [Section] 2511(b), this Court has ample evidence to conclude that termination best suits the needs and welfare of these [C]hildren. Dr. O'Hara opined that the [C]hildren were in need of structure, stability and permanency and that he did not have sufficient evidence that Mother or Father were in a position to appropriately care for the [C]hildren. This Court finds that the benefits of adoption outweigh any potential detriment that accompanies termination of these parent's [sic] rights. This Court concludes that the bonds between these children and their parents is not significant enough to disrupt the permanency that these

> [C]hildren have achieved in their respective foster homes. There is no doubt that these parents love and care for their [C]hildren but that alone is not enough to prevent the termination of parental rights. ***In re L.M.***, 923 A.2d 505, 512 (Pa.Super. 2007). All four children are in homes that provide them with security, stability and safety. It is the opinion of this Court that [CYF] has proven by clear and convincing evidence that grounds for termination exist pursuant to [Section] 2511(a)(2)(5)(8) [sic] and that termination best suits the needs and welfare of these four [C]hildren.

Trial court opinion, 1/24/17 at 26-28.

The record supports the trial court's factual findings, and the trial court's legal conclusions are not the result of an error of law or an abuse of discretion. Therefore, we affirm the trial court's order with regard to Subsection (b).

As a final matter, Mother, in her reply brief, cites to our supreme court's recent decision in ***In re L.B.M.***, 2017 Pa. LEXIS 680 (Pa. March 28, 2017), wherein the court held that 23 Pa.C.S.A § 2313(a) requires the trial court to appoint counsel for a child in a TPR case and the failure to do so is structural and can never be harmless. In her reply brief, Mother posits that the guardian ***ad litem*** ("GAL") in this case, Attorney Andrea Spurr from KidsVoice, at all times represented the children as GAL and not as appointed counsel. The only form of relief requested by Mother appears to be that the record should be made clear on this point. (Mother's reply brief at 1.) In response to Mother's reply brief, Attorney Spurr filed an Application for

Correction requesting that we accept and insert her corrected cover sheet indicating that she represents the Children as GAL and not as legal counsel.

As a point of information, Justice Wecht's opinion in **L.B.M** states that the trial court is required to appoint a separate, independent attorney to represent a child's legal interests even when the child's GAL, who is appointed to represent the child's best interests, is an attorney. Justice Wecht would hold that the interests are distinct and require separate representation. While Justice Wecht, joined by Justices Donohue and Dougherty, sought to so hold, four members of the court, Chief Justice Saylor and Justices Baer, Todd, and Mundy disagreed in different concurring and dissenting opinions with that part of the lead opinion's holding. Specifically, while the other justices agreed that the appointment of counsel for the child is required in all TPR cases and that the failure to do so by the trial court is a structural error, they did not join that part of Justice Wecht's opinion which sought to hold that the GAL may never serve as counsel for the child. Rather, such separate representation would be required only if the best interests and legal interests were somehow in conflict.

In any event, Attorney Spurr's request to correct her brief is denied. As our decision discusses, the Children's best interests and legal interests were unquestionably well represented by Attorney Spurr in this case and such interests were never in conflict.

Order affirmed. Application to correct denied.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/15/2017